# YOUNG CONAWAY STARGATT & TAYLOR, LLP

BEN T. CASTLE
SHELDON N. SANDLER
RICHARD A. LEVINE
RICHARD A. ZAPPA
FREDERICK W. IOBST
RICHARD H. MORSE
DAVID C. MCBRIDE
JOSEPH M. NICHOLSON
CRAIG A. KARSNITZ
BARRY M. WILLOUGHBY
JOSY W. INGERSOLL
ANTHONY G. FLYNN
JEROME K. GROSSMAN
EUGENE A. DIPRINZIO
JAMES L. PATTON, JR.
ROBERT L. THOMAS
WILLIAM D. JOHNSTON
TIMOTHY J. SNYDER
BRUCE L. SILVERSTEIN
WILLIAM W. BOWSER
LARRY J. TARABICOS
RICHARD A. DILIBERTO, JR.
MELANIE K. SHARP
CASSANDRA F. ROBERTS
RICHARD J.A. POPPER
TERESA A. CHEEK
NEILLI MULLEN WALSH
JANET Z. CHARLTON

ROBERT S. BRADY
JOEL A. WAITE
BRENT C. SHAFFER
DANIEL P. JOHNSON
CRAIG D. GREAR
TIMOTHY JAY HOUSEAL
MARTIN S. LESSNER
PAULINE K. MORGAN
C. BARR FLINN
NATALIE WOLF
LISA B. GOODMAN
JOHN W. SHAW
JAMES P. HUGHES, JR.
EDWIN J. HARRON
MICHAEL R. NESTOR
MAUREEN D. LUKE
ROLIN P. BISSELL
SCOTT A. HOLT
JOHN T. DORSEY
M. BLAKE CLEARY
CHRISTIAN DOUGLAS WRIGHT
DANIELLE GIBBS
JOHN J. PASCHETTO
NORMAN M. POWELL
ELENA C. NORMAN
EDMON L. MORTON
JOHN E. TRACEY

JOSEPH M. BARRY
RYAN M. BARTLEY
SEAN M. BEACH
SANJAY BHATNAGAR
DONALD J. BOWMAN, JR.
MICHELE SHERRETTA BUDICAK
JEFFREY T. CASTELLANO
DOUGLAS T. COATS (MD ONLY)
KARA HAMMOND COYLE
KRISTEN SALVATORE DEPALMA
MARGARET M. DIBIANCA
MARY F. DUGAN
ERIN EDWARDS
KENNETH J. ENOS
KERRIANNE MARIE FAY
IAN S. FREDERICKS
JAMES J. GALLAGHER
WILLIAM E. GAMGORT
SEAN T. GREECHER
NATHAN D. GROW
STEPHANIE L. HANSEN
JAMES L. HIGGINS
PATRICK A. JACKSON
DAWN M. JONES
KAREN E. KELLER

JENNIFER M. KINKUS
EDWARD J. KOSMOWSKI
EVANGELOS KOSTOULAS
JOHN C. KUFFEL
TIMOTHY E. LENGKEEK
ANDREW A. LUNDGREN
MATTHEW B. LUNN
ADRIA B. MARTINELLI
KATHALEEN MCCORMICK
MICHAEL W. MCDERMOTT
TAMMY L. MERCER
MARIBETH L. MINELLA
D. FON MUTTAMARA-WALKER
JENNIFER R. NOEL
ADAM W. POFF
ROBERT F. POPPITI, JR.
SARA BETH A. REYBURN
CHERYL A. SANTANIELLO
MONTÉ T. SQUIRE
MICHAEL P. STAFFORD
CHAD S.C. STOVER
RICHARD J. THOMAS
TRAVIS N. TURNER
MARGARET B. WHITEMAN
SHARON M. ZIEG

SPECIAL COUNSEL
JOHN D. MCLAUGHLIN, JR.
KAREN L. PASCALE
SETH J. REIDENBERG
PATRICIA A. WIDDOSS

SENIOR COUNSEL
CURTIS J. CROWTHER

OF COUNSEL
BRUCE M. STARGATT
STUART B. YOUNG
EDWARD B. MAXWELL, 2ND

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE 19801

P.O. BOX 391
WILMINGTON, DELAWARE 19899-0391

(302) 571-6600
(800) 253-2234 (DE ONLY)
FAX: (302) 571-1253

110 WEST PINE STREET
P.O. BOX 594
GEORGETOWN, DELAWARE 19947
(302) 856-3571
(800) 255-2234 (DE ONLY)
FAX: (302) 856-9338

WWW.YOUNGCONAWAY.COM

DIRECT DIAL: 302-571-6698
DIRECT FAX: 302-576-3309
mlessner@ycst.com

March 31, 2008

## BY CM/ECF AND HAND DELIVERY

The Honorable Peter T. Dalleo
Clerk of the Court
United States District Court
844 King Street
Wilmington, DE 19801

Re:    *W.L. Gore & Associates, Inc. v. Rosenmayer*
       Civil Action No. 08-cv-177

Dear Mr. Dalleo:

On behalf of plaintiff W.L. Gore and Associates, Inc. ("Gore"), we write to request that the above captioned matter be assigned to a judge on an expedited basis.

On Friday, March 28, 2008, Gore filed a Motion for a Temporary Restraining Order and Verified Complaint in the Delaware Court of Chancery (C.A. No. 3661), seeking to enjoin defendant Charles Rosenmayer ("Dr. Rosenmayer"), a Gore employee, from violating his contractual obligations to Gore of confidentiality and noncompetition. Dr. Rosenmayer had recently stated his intention commence employment with Plastomer, a direct competitor of Gore, starting on Tuesday, April 1, 2008.

Late last night (Sunday night), defendant Dr. Rosenmayer filed a "Notice of Removal" pursuant to 28 U.S.C. §§1332, 1441 and 1446, removing this action from the Court of Chancery of the State of Delaware to the United States District Court for the District of Delaware. For your convenience, a copy of the Notice of Removal, the Verified Complaint, Motion for

YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Honorable Peter T. Dalleo
March 31, 2008
Page 2

Temporary Restraining Order, Memorandum of Law in Support thereof, and Proposed Form of
Order (Exhibits A-D to the Notice of Removal) are attached to this letter.

As demonstrated in its moving papers, given the defendant's April 1 start date with a
direct competitor, Gore is entitled to a TRO because (1) it has a colorable claim; (2) the
possibility of irreparable harm to Gore if the TRO is not granted; and (3) the balance of
hardships favors the granting of the TRO.

In sum, plaintiff Gore requests the expedited assignment of this matter to a judge, such
that Gore's TRO application may be heard on an expedited basis.

We are available at the convenience of the Court.

Respectfully,

o/b/o Martin Lessner by

Martin S. Lessner (#3109)    (# 4461)

MSL:mr

cc:    Jami B. Nimeroff, Esquire
       Charles Knapp, Esquire

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| W.L. GORE & ASSOCIATES, INC., | |
| Plaintiff, | C.A. No. _____ |
| v. | |
| CHARLES THOMAS ROSENMAYER, Ph.D., | |
| Defendant. | |

## <u>NOTICE OF REMOVAL</u>

Defendant Charles Thomas Rosenmayer, Ph.D. ("Defendant"), by and through his undersigned counsel, pursuant to 28 U.S.C. §§1332, 1441 and 1446, hereby provides Notice of Removal of this action from the Court of Chancery of the State of Delaware to the United States District Court for the District of Delaware, and in support thereof states:

1.    On March 28, 2008, Plaintiff W.L. Gore & Associates, Inc., instituted this action by filing a Verified Complaint titled *W.L. Gore & Associates, Inc. v. Charles Thomas Rosenmayer, Phd.*, in the Court of Chancery of the State of Delaware, which it appears as of the filing of this Notice has not received a docket number. A true and correct copy of the Verified Complaint is attached hereto as Exhibit "A".

2.    Plaintiff also filed a Motion for Temporary Restraining Order, Memorandum of Law in Support thereof, Proposed Form of Order and a Compendium of Unpublished Cases, true and correct copies of which are attached hereto as Exhibits "B," "C," "D," and "E" respectively.

3.    Plaintiff also filed a Motion for Appointment of Special Process Server, along with a supporting Affidavit and Form of Order, a true and correct copy of which is collectively attached hereto as Exhibit "F."

4.    In its complaint, Plaintiff alleges breach of contract and seeks to enjoin Dr. Rosenmayer from commencing employment with a company in Texas.

5.    On March 29, 2008, plaintiff forwarded by email a copy of the above pleadings to defendant's counsel.

6.    This Notice is timely filed pursuant to 28 U.S.C. § 1446(b) in that it is filed within thirty days after receipt by the Defendant of the initial pleading.

7.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1332, because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and the action is between citizens of different states.

8.    Plaintiff is a Delaware corporation with its principal place of business in Newark, Delaware.

9.    Defendant is a Pennsylvania resident and is not a citizen of the forum state.

10.    Plaintiff seeks to enforce a restrictive covenant and preclude disclosure of its alleged trade secrets, the value of which satisfies the amount in controversy.

2

11.     A true and correct copy of this Notice of Removal will be promptly filed

with the Clerk of the Court of Chancery of the State of Delaware as provided by 28

U.S.C. §1446(d).

Dated: March 30, 2008
            Wilmington, Delaware

                                                        Respectfully submitted,

                                                        BROWN STONE NIMEROFF LLC

                                                        /s/ Jami B. Nimeroff
                                                        Jami B. Nimeroff, Esquire (No. 4049)
                                                        4 East 8th Street, Suite 400
                                                        Wilmington, DE  19801
                                                        Tel: (302) 428-8142
                                                        Fax: (302) 351-2744

                                                        Mary Kay Brown, Esquire
                                                        BROWN STONE NIMEROFF LLC
                                                        1818 Market Street, Suite 2300
                                                        Philadelphia, PA 19103
                                                        Tel: (267) 861-5330
                                                        Fax: (267) 350-9050

                                                        *Attorneys for Defendant Charles Thomas*
                                                        *Rosenmayer, Ph.D.*

## CERTIFICATE OF SERVICE

I, Jami B. Nimeroff, hereby certify that on this 30th day of March, 2008, I caused

to be served a true and correct copy of the foregoing Notice of Removal by electronic

mail upon the following:

>Martin S. Lessner, Esquire
>Young Conaway Stargatt & Taylor, LLP
>1000 West Street, 17th Floor
>P.O. Box 391
>Wilmington, Delaware  19899-0391

Dated: March 30, 2008

>BROWN STONE NIMEROFF LLC
>
>/s/ Jami B. Nimeroff
>Jami B. Nimeroff, Esquire (No. 4049)
>4 East 8th Street, Suite 400
>Wilmington, DE  19801
>Tel: (302) 428-8142
>Fax: (302) 351-2744

4

# EXHIBIT A

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

W.L. Gore. & Associates, Inc.,

                              Plaintiff,          C.A. No. _____

vs.

Charles Thomas Rosenmayer, PhD.,              **VERIFIED COMPLAINT**

                              Defendant.

    Plaintiff W.L. Gore & Associates, Inc. ("Gore"), by and through its undersigned

counsel, hereby alleges for its Verified Complaint, as follows:

## INTRODUCTION

    1.    This action is brought to enjoin the defendant's announced intention to violate

his contractual obligations to Gore of confidentiality and noncompetition. These obligations

are set forth in multiple confidentiality and noncompetition agreements signed by defendant

during his sixteen years of employment with Gore.

    2.    On or about March 13, 2008, defendant Charles Thomas Rosenmayer, PhD.

("Dr. Rosenmayer" or "defendant") advised Gore that he was considering accepting an offer

of employment with Plastomer Technologies ("Plastomer") as its Vice President and General

Manager. Plastomer is a direct competitor of Gore and engaged in some of the same

businesses as Gore. Gore advised Dr. Rosenmayer that his proposed new employment was

unacceptable insofar as it violated Dr. Rosenmayer's contractual obligations to Gore. Gore

offered to continue Dr. Rosenmayer's employment or to pay for a headhunter to assist Dr.

Rosenmayer to find employment that did not violate his contractual obligations to Gore. On

March 25, 2008, Dr. Rosenmayer refused Gore's offer, proffered his resignation of

employment with Gore, and advised Gore that he intended to commence employment with

Plastomer on Tuesday, April 1, 2008.

3.     Unless Dr. Rosenmayer is immediately enjoined from violating his contractual

obligations to Gore, Gore will suffer irreparable harm.  Accordingly, Gore has commenced

this action seeking temporary, preliminary, and permanent injunctive relief, and such other

relief as the court deems just and proper.

## PARTIES

4.     Gore is a privately held corporation organized and existing under the laws of

the State of Delaware, having its principal place of business at 555 Papermill Road, Newark,

Delaware.

5.     Founded in 1958, Gore currently employs approximately 8,000 associates in

45 locations around the world.  Gore's proprietary technologies encompassing polymers

made or derived from the fluoropolymer polytetrafluoroethylene ("PTFE"), have resulted in

numerous products and product applications for the wire and cable, fabric, medical, filtration

membrane, sealant, and other applications in diverse industries.

6.     Dr. Rosenmayer, is a resident of the State of Pennsylvania, residing at 4

Edward Drive, Avondale, Pennsylvania.  From January 1992 until the present, Gore has

employed Dr. Rosenmayer, most recently at one of its Elkton, Maryland facilities.  Dr.

Rosenmayer is a materials scientist with a B.S. in metallurgical engineering from the

University of Missouri, and a PhD. in materials science from Rice University.

7.     Dr. Rosenmayer has had regular contacts with Delaware over the course of his

employment with Gore.  His Elkton, Maryland office was approximately 10 miles from

Gore's corporate headquarters in Newark, Delaware, as is his Avondale, Pennsylvania

residence. As part of his employment with Gore, Dr. Rosenmayer has attended training

meetings in Delaware, including three training sessions on Intellectual Property and

Development Planning in the last eighteen months. Dr. Rosenmayer attended research and

development meetings at Clayton Hall at the University of Delaware that are held on a

monthly basis and which are open only to higher-level Gore associates. Indeed, Dr.

Rosenmayer was responsible for organizing the presentations for these Clayton Hall

meetings on several occasions. Dr. Rosenmayer participated in a number of Gore

Intellectual Property Committee meetings that were held in Delaware, and has attended other

work-related meetings regarding Gore's business in Delaware. Patent applications filed by

Gore based on inventions for which Dr. Rosenmayer was an inventor were processed and

filed out of Gore's Delaware offices. Dr. Rosenmayer's payroll and benefits were

administered out of Delaware, and the special payments he received in consideration for

signing the agreements discussed below were paid out of Gore's corporate payroll offices in

Delaware. Documents relating to Dr. Rosenmayer's employment, including copies of

agreements at issue in this litigation, are maintained at Gore's corporate offices in Delaware.

## FACTUAL BACKGROUND

8.      Gore hired Dr. Rosenmayer in January 1992 to work as a materials scientist

assigned to Gore's then-wire and cable manufacturing facility in Manor, Texas. Since that

time, Dr. Rosenmayer has worked for Gore in a number of locations, performing a number of

important job duties that have involved increasing access to Gore's core technologies and

research and development efforts.

9.      Dr. Rosenmayer had little, if any, substantive work experience with PTFE

technology or products before coming to work at Gore.

10. Dr. Rosenmayer transferred to a Gore facility in Eau Claire, Wisconsin in approximately 1995, where Gore manufactured semi-conductor technologies using PTFE microemulsions. In this position, Dr. Rosenmayer worked closely with a Gore joint venture research facility in Shanghai, China (Shanghai Gore 3F FluoroMaterials Company, Ltd.) in working on the development of novel fluoropolymer materials to enhance the performance of semi-conductors and other microelectronics.

11. In 2000, Dr. Rosenmayer was promoted to the position of Research and Development leader at Gore's Putzbrunn, Germany PTFE manufacturing facility. In this position, Dr. Rosenmayer had considerable and intimate access with Gore's PTFE technology, polymerization processes, business plans and partnerships, and had the potential to improve or change those details through his activities. As Research and Development leader, Dr. Rosenmayer served on Gore's world-wide core technology leadership team with other top Gore technology leaders throughout the world. This team met regularly to discuss intimate details regarding Gore's research and development, technological processes, business plans and strategies.

12. Dr. Rosenmayer transferred back to Gore's U.S. operations in approximately 2006, and has since that time officed out of a Gore facility in Elkton, Maryland. Since 2007, Dr. Rosenmayer has served as Gore's worldwide Project Champion for the Gore Microelectronics Process Core Team. In that position, Dr. Rosenmayer has been responsible for leading a small, extended team of Gore leaders in interfacing with other Gore business teams, including the sealant, industrial filtration, fabrics, wire and cable teams, in an effort to enhance and further develop Gore's existing PTFE applications business in the microelectronics industry. As Project Champion, Dr. Rosenmayer assumed responsibility for

all aspects of this business, including research and development, manufacturing, marketing, sales, and the interaction with all other aspects of Gore's business.

13.    Dr. Rosenmayer is the named inventor on at least eight patents relating to Gore technology, including two that were only filed within the last year.

14.    Dr. Rosenmayer was a highly paid Gore employee, having received an annual salary in 2007 of over $150,000.

**Gore's Efforts To Protect Its Information**

15.    Gore has invested substantial money, time, and effort researching the attributes of PTFE and other fluoropolymers, their methods of manufacture, and refining their use for commercial applications. This trade secret technology is extremely valuable to Gore.

16.    To maintain the secrecy of its information and maintain its competitive position, Gore spends substantial time, effort, and money to develop and maintain the confidentiality of its trade secrets. Gore requires each employee to sign an agreement in which the employee acknowledges the nature of Gore's trade secret and confidential information, agrees not to disclose the information, and agrees not to compete with Gore after the termination of their employment. In addition, Gore protects its trade secrets through complex, high-level security measures including security cameras, full-time security personnel, and an electronic key card system that regulates access to various areas within the facility and monitors and records the coming and going of all personnel. Visitors to the facilities must sign in at the front entrance and must be escorted about the facility. Gore regularly conducts workshops reminding its employees of the criticality of protecting Gore's trade secrets.

17.    Gore trade secret and confidential information is disclosed only on a need-to-know basis, and all associates a e trained on this need-to-know policy.  The components, chemistry, manufacturing methods and processing, research and development of PTFE and PTFE-containing products are deemed by Gore to be secret and are even protected from open disclosure within Gore by additional confidentiality agreements ("TFE Agreements") and highly controlled access.  For example, Gore restricts access to certain areas within its facilities in which this work takes place, and documents and internal presentations at which this work is discussed, only to the relatively small group of employees who have signed the TFE Agreements.

**Dr. Rosenmayer's Service Agreement**

18.    On January 6, 1992, at the inception of his employment, Dr. Rosenmayer executed a standard Gore service agreement (the "Service Agreement").  (A copy of the Service Agreement is attached hereto as Exhibit A.)  In this agreement, Dr. Rosenmayer acknowledged that:

- Gore developed its "paper work, documents and know-how," including "customer lists, manufacturing processes, devices, techniques, plans, methods, drawings, blueprints reproductions, data, tables, calculations, and letters . . . at great expense and over a lengthy period of time;"

- this information is "unique and constitute[s] the exclusive property and trade secrets of Gore;"

- any use of this information by Dr. Rosenmayer "other than for the sole benefit of Gore" would be wrongful and would injure Gore irreparably;

- Dr. Rosenmayer could not disclose or use this information for his own benefit or the "direct or indirect" benefit of anyone other than Gore without Gore's written consent;

- if Dr. Rosenmayer violated the Agreement, Gore would be entitled to preliminary and permanent injunctive relief and an equitable accounting;

- if his employment was terminated, Dr. Rosenmayer would promptly deliver back to Gore all Gore information "in his possession or under his control" and would "not engage in any business activity in competition with Gore" for one year thereafter;

- if, during his employment or for three years afterward, Dr. Rosenmayer made or conceived "improvements or inventions" relating in any way to Gore's activities or business, Dr. Rosenmayer would promptly disclose them and they would be Gore's property exclusively; and

- upon termination of his employment, Dr. Rosenmayer would not "engage in any business activity in competition with Gore for a period of one (1) year thereafter."

## Dr. Rosenmayer's TFE Agreements

19.    As a condition of being granted access to Gore's TFE technology, Gore required Dr. Rosenmayer to execute a second agreement, entitled "Tetrafluoroethylene Polymers Confidentiality and Non-Competition Agreement" (the "TFE Agreement"). Dr. Rosenmayer was first asked to sign a TFE Agreement after his transfer to Gore's Eau Claire facility, and has signed successive TFE Agreements thereafter. Dr. Rosenmayer received additional compensation from Gore each year in consideration of signing these agreements. For example, Dr. Rosenmayer received a $400 bonus in 2005, 2006, 2007, and 2008 for signing the TFE Agreement in each of those years. A copy of the most recent agreement executed by Dr. Rosenmayer is attached hereto as Exhibit B. In this agreement, Dr. Rosenmayer acknowledged that:

- Gore had invested "considerable time, effort, and many millions of dollars" in developing and refining technology involving PTFE and other tetrafluoroethylene polymers;

- Gore intended to continue to develop and refine this technology, and Gore's continued success depended upon this technology remaining the sole property of Gore, and not known to or used by others; and

- Gore had entrusted Dr. Rosenmayer with know-how, and Dr. Rosenmayer "recognizes the valuable and confidential nature of this know-how" and "understands that its use or knowledge by others would be detrimental to Gore."

20.    In the TFE Agreement, Dr. Rosenmayer agreed that:

- The TFE agreement was additional and supplemental to Dr. Rosenmayer's existing Service Agreement regarding confidentiality and noncompetition;

- Dr. Rosenmayer would "promptly and fully inform and disclose to Gore all inventions, design improvements, and discoveries" made or conceived during his employment with Gore, whether Dr. Rosenmayer conceived them "alone or with others and whether or not conceived during regular working hours. All such inventions, designs, improvements and discoveries shall be the exclusive property of Gore;"

- while employed with Gore, Dr. Rosenmayer would "have access t and become familiar with various confidential know-how and trade secrets" of Gore, including information "used by Gore in manufacture, selection, purchasing and transportation of PTFE and other polymers containing TFE, the manufacturing of products from PTFE and other polymers containing TFE, dealing in products made therefrom, or research and development concerning the same;"

- Dr. Rosenmayer "shall not disclose any Gore confidential know-how or trade secrets, directly or indirectly, nor use them in any way, either during the term of this Agreement or any time thereafter, except in a manner authorized by Gore;"

- "[a]ll files, records, documents, drawings, specifications, equipment, and similar items relating to Gore's business or research activities, whether prepared by [Dr. Rosenmayer] or otherwise coming into his[] possession, shall remain the exclusive property of Gore" and Dr. Rosenmayer would "safeguard their confidentiality and return them to Gore when []he terminates;" and

- for two years after termination of his employment with Gore, Dr. Rosenmayer "shall not for any reason, directly or indirectly, by any means or device whatsoever . . . compete with Gore by associating himself[] in any way with a person or entity that is involved in the manufacturing, purchasing, selecting, or transportation of PTFE . . . or conducting research and development concerning the same."

## Dr. Rosenmayer's Access To Gore Trade Secret Information

21.    For over ten years, Dr. Rosenmayer has worked on highly sensitive and proprietary Gore projects. He has had intimate access to Gore's PTFE technology, manufacturing processes, intellectual property discussions, business plans and strategic planning.

22.    Dr. Rosenmayer is a global research and development leader for Gore, and from 2000 through 2006 was responsible for the manufacture, processing, and improvement of technologies relating to the manufacturing and process of PTFE.

23.    Dr. Rosenmayer is currently heading up a team of Gore associates responsible for the development of an entire line of business for Gore in the microelectronics area.

24.    Given his status with the Company, Dr. Rosenmayer has been allowed to attend meetings and receive internal documents in which the most sensitive of Gore trade secret information is discussed regarding all aspects of the Company's business, including Gore Intellectual Property Committee meetings, Clayton Hall meetings, and Gore Core Technology Leadership Team meetings. In addition, as a core technology leader at Gore, Dr. Rosenmayer received regular "TFE Polymerization Platform Monthly Technical Reports," which are replete with proprietary technical detail, and summarized in technical detail the status of various Gore research and development projects throughout the company. These reports included proprietary information on projects involving Gore's pioneering efforts in

other areas, including biomedical and fuel cell applications. Each and every one of these

internal report were marked "CONFIDENTIAL GORE PTFE TECHNOLOGY" and the

distribution was limited to a handful of top Gore research and development leaders. Further

dissemination of the reports were expressly limited to "PTFE Agreement signers only."

**Dr. Rosenmayer Announces His Intent to Breach His Contractual Obligations to Gore**

25.    Dr. Rosenmayer has voluntarily resigned his employment with Gore effective

March 31, 2008, and has advised Gore that he had accepted employment with Plastomer as

its Vice President and General Manager effective April 1, 2008.

26.    Plastomer is a division of EnPro Industries, Inc. ("EnPro"). EnPro operates 35

manufacturing facilities throughout North America, Asia and Europe, and purports to be a

"leading provider of engineered industrial products for the process and general

manufacturing industries worldwide." EnPro's website indicates that EnPro's products and

services include PTFE films, sealant tapes, gaskets, compounds, PTFE machining and

fabrication, and fluoropolymer surface modifications

27.    Dr. Rosenmayer has provided Gore a copy of the job description for the job he

has accepted (the "Job Description"). It is attached as Exhibit C.

28.    The Job Description states that Plastomer is a "provider of PTFE . . . solutions

focusing on creative and innovative products . . . for a wide range of industrial arenas,"

including "wire and cable, filtration, electronic, medical, oral care, outdoor fabric and

countless others." This statement is equally descriptive of Gore, as well.

29.    The Job Description states that Plastomer currently sells into the semi

conductor and medical industries, among others, and that "experience in these areas would

be beneficial."

30.    Indeed, Plastomer and Gore both manufacture PTFE and are engaged in processing PTFE into tapes and fibers for, among other uses, applications in industrial products, such as wire and cable, microelectronics, sealants and membranes. As noted above, Dr. Rosenmayer served as Gore's Research and Development leader at Gore's Putzbrunn, Germany facility for approximately six years.

31.    Both Plastomer and Gore manufacture the same category of products utilizing PTFE technology, including tape for cable assemblies, and PTFE applications for the microelectronics industry, including semi-conductors. Dr. Rosenmayer has been involved in all of these applications at Gore since he was hired in 1992, and has served as Gore's Project Champion for the Microelectronics Process Core Team (which has targeted, among other industries, the semi-conductor industry) since 2007.

32.    The Job Description states that as Vice President and General Manager of Plastomer, Dr. Rosenmayer will be responsible for the overall management of Plastomer, including: (1) developing business strategies and evaluating business opportunities; (2) developing marketing strategies and evaluating market conditions; (3) providing management leadership to all functional areas of Plastomer, including research, development and manufacturing personnel.

33.    The Job Description states that "the ideal candidate will have PTFE, performance polymer or composite experience."

## COUNT I

### (Breach of Contract)

34.    Gore restates and realleges all previous paragraphs.

35.    As a condition of his employment with Gore commencing in 1992, Dr. Rosenmayer signed the Service Agreement attached hereto as Exhibit A. Dr. Rosenmayer also signed successive versions of the TFE Agreement over the course of the last decade, the most recent of which is attached as Exhibit B.

36.    Gore has fully complied with all of its obligations under each of these agreements.

37.    Dr. Rosenmayer has repudiated and breached these agreements with Gore by accepting the above-referenced employment with Plastomer, and proceeding with his announced employment with Plastomer to begin on April 1, 2008. Dr. Rosenmayer's employment with Plastomer violates his obligation as agreed to in the Service Agreement to refrain from engaging in any business activity in competition with Gore for a period of one year following the termination of his employment. Such employment also violates Dr. Rosenmayer's obligation as repeatedly agreed to in the TFE Agreements to refrain from directly or indirectly associating with any entity involved in the manufacturing, research or development of TFE-containing polymers, including PTFE, and products made therefrom.

38.    Given the high-level nature of his position with Gore, and the high-level nature of his anticipated position with Plastomer, it is inevitable that Dr. Rosenmayer would disclose proprietary and confidential Gore information to Plastomer in further breach of his duties of non-disclosure, as set forth in both the Service Agreement and the TFE Agreements.

39.    Gore has no adequate remedy at law for Dr. Rosenmayer's announced breach of contract. In both the Service Agreement and TFE Agreement, Dr. Rosenmayer agreed that a violation of the agreements entitled Gore to preliminary and permanent injunctive

relief. If not enjoined, Dr. Rosenmayer will cause irreparable harm to the rights of Gore and to Gore's business, reputation, and goodwill.

WHEREFORE, Gore demands judgment against the defendant and respectfully requests that the Court:

1.    Issue a temporary restraining order in the form proposed herewith;

2.    Issue orders preliminarily and permanently enjoining Dr. Rosenmayer from all further unlawful conduct, as described above, and directing defendant to take appropriate steps to remedy any unlawful conduct, including but not limited to refraining from any further misconduct, accounting for and returning all Gore property and information in their possession or under their control; and

3.    Order all other relief that the Court deems proper and just in the circumstances.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Martin S. Lessner
Martin S. Lessner, Esquire (No. 3109)
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone: (302) 571-6698
Facsimile: (302) 576-3309

Attorneys for Plaintiff W.L. Gore & Associates, Inc.

Of Counsel:

Charles Knapp
Julie Giddings
FAEGRE & BENSON
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000
(612) 766-1600

Dated: March 28, 2008

051718.1001

## VERIFICATION

STATE OF DELAWARE          )
                           )    SS.:
COUNTY OF NEW CASTLE       )

    I, Paul Fischer, upon oath state that I am an authorized agent of W.L. Gore & Associates, Inc. ("Gore"), that I have read the foregoing Verified Complaint, and to the best of my knowledge, the facts alleged therein insofar as it concerns Gore is true, and insofar as it concerns all other persons, is believed by me upon information and belief to be true.

               W.L. Gore & Associates, Inc.


               BY: _____
                    Paul Fischer
                    Core Technology Division Leader


SWORN TO before me this 26th day of March 2008.

_Suzanne M. Hearn_
Notary Public
Commission Expires   8\26\2010

           Suzanne M. Hearn
            Notary Public
           State of Delaware

fb.us.2727901.04

# EXHIBIT A



**W. L. GORE & ASSOCIATES, INC.**

7811 BURLESON-MANOR ROAD • P.O. DRAWER Q • MANOR, TEXAS 78653 • PHONE: 512/276-7600

Creative Technologies
Worldwide

## AGREEMENT

For and in consideration of the sum of One ($1.00) Dollar paid to the undersigned by W. L. Gore & Associates, Inc., (hereinafter called "GORE") at the date hereof, receipt of which is hereby acknowledged, and such other good and valuable consideration, including, but not limited to, employment by Gore commencing ___1/6/92___, the undersigned hereby agrees with Gore as follows:

(1) The undersigned acknowledges that the customer lists, manufacturing processes, devices, techniques, plans, methods, drawings, blueprints, reproductions, data, tables, calculations, letters or other paper work, documents and know-how of Gore were designed and developed by Gore at great expense and over lengthy periods of time, are secret and confidential, are unique and constitute the exclusive property and trade secrets of Gore and that any use of such property and trade secrets by the undersigned other than for the sole benefit of Gore would be wrongful and would cause irreparable injury to Gore.

(2) The undersigned shall not, at any time, without the express written consent of an officer of Gore, publish, disclose or divulge to any person, firm, or corporation, or use directly or indirectly, or use for his own benefit or for the benefit of any person, firm, corporation or use other than Gore, any property, trade secrets or confidential information of Gore, its subsidiaries and its affiliates learned or obtained by him from Gore, including, but not limited to, the information and things set forth in paragraph (1) hereinabove.

(3) This agreement shall be binding upon the undersigned, his personal representatives, successors and assigns, and shall run to the benefit of Gore, its successors and assigns.

(4) The undersigned hereby acknowledges and agrees that in the event of any violation hereof, Gore shall be authorized and entitled to obtain from any Court of competent jurisdiction preliminary and permanent injunctive relief as well as an equitable accounting of all profits or benefits arising out of such violation, which rights and remedies shall be cumulative and in addition to any other rights or remedies to which Gore may be entitled.

(5) Upon termination of this employment, the undersigned shall promptly deliver to Gore all drawings, blueprints, reproductions, manuals, letters, notes, notebooks, reports, data, tables, calculations or copies thereof, and all other secret and confidential property of Gore, its subsidiaries and affiliates, including, but not limited to, all property set forth in paragraph (1) herein above, which are in his possession or under his control.

(6) Upon termination of this employment, the undersigned agrees that he will not engage in any business activity in competition with Gore for a period of one (1) year thereafter.

GORE-TEX, GFO and RASTEX are trademarks of W.L. Gore & Associates, Inc.

**EXHIBIT A**

(7)  The undersigned shall promptly disclose any and all improvements and inventions conceived or made by him during the period of his said employment relating in any way to the activities or business of Gore, and any and all such improvements and inventions shall be the sole and exclusive property of Gore or its nominee and the undersigned shall do whatever is proper and necessary to vest title in all said improvements and all said inventions in Gore or its nominee.

Whenever requested to do so by Gore, the undersigned shall execute any and all applications, assignments and other instruments which Gore shall deem necessary in order to apply for and obtain Letters Patent of the United States and foreign countries covering said improvements or inventions coming within this Item 7 and in order to assign and convey to Gore or its nominee the sole and exclusive right, title and interest therein.

These obligations shall continue beyond the termination of the period of employment for a period of three years with respect to improvements or inventions conceived or made by the undersigned during the period of said employment, and shall be binding upon his assigns, executors, administrators or other legal representatives.

(8)  Inventions, patented or unpatented, made or conceived prior to the undersigned's employment by Gore are excluded from this Agreement.

(9)  With respect to inventions, patented or unpatented, made or conceived by the undersigned during his course of employment with Gore which inventions do not relate to or are not in connection with the said business products of Gore, Gore may, in its own discretion, grant a waiver or a release to the undersigned thereon but such waivers or releases shall be granted only after consideration by Gore of the undersigned's written request therefore and will not be withheld without good reason.

IN WITNESS WHEREOF, the undersigned has hereunto set his hand and seal the date and year first above written.

_____ *Charles J. Bozzuzys* _____ SEAL

Witness: *Belinda K Ueling*

Date: 1 - 6 - 92

W. L. GORE & ASSOCIATES, INC.

By: _____

# EXHIBIT B

## TETRAFLUOROETHYLENE POLYMERS CONFIDENTIALITY AND NON-COMPETITION

## AGREEMENT

This Agreement is between W. L. Gore & Associates, Inc., ("GORE") a Delaware
Corporation having a principal place of business at 555 Paper Mill Road, Newark,
Delaware 19711 and Tom Rosenmayer ("ASSOCIATE").

BACKGROUND

W. L. Gore & Associates, Inc. ("GORE") has, over a period of years, invested
considerable time, effort and many millions of dollars in developing and refining
technology for the synthesis, characterization and processing of
polytetrafluoroethylene (PTFE) and other polymers containing tetrafluoroethylene (TFE)
into useful products. Some of this technology is patented. Much, however, is know-
how that has been kept confidential by GORE. This confidential know-how is an
extremely valuable asset of GORE and has significantly contributed to the success of
GORE, enabling GORE to sell its products and provide its services throughout the world.

GORE intends to continue to develop and refine this technology. In order to
ensure the continued success of the Company, it is essential that past, current and
future know-how remain the sole property of GORE and not become known to, or used
by others, particularly competitors.

GORE has entrusted ASSOCIATE with know-how. GORE desires to continue to
disclose and entrust to ASSOCIATE its existing and future know-how and have
ASSOCIATE work with, develop and refine such know-how. ASSOCIATE recognizes the
valuable and confidential nature of this know-how and acknowledges that (s)he
understands that its use or knowledge by others would be detrimental to GORE.
ASSOCIATE agrees as follows:

Page 1 of 5                    (Initials) *TR*

**EXHIBIT B**

I.     SUPPLEMENTAL AGREEMENT

This Agreement is in addition to and supplements ASSOCIATE'S existing

confidentiality and non-competition agreement. The time periods during which

ASSOCIATE agrees not to compete with GORE are not cumulative.

II.     INVENTIONS AND PATENTS

ASSOCIATE agrees that (s)he will promptly and fully inform and disclose to GORE

all inventions, design improvements, and discoveries which (s)he has now made or

conceived or may later make or conceive during his/her term of employment, which

pertain or relate to the business of GORE or to any experimental work carried on by

GORE, whether conceived by ASSOCIATE alone or with others and whether or not

conceived during regular working hours. All such inventions, designs, improvements,

and discoveries shall be the exclusive property of GORE. ASSOCIATE shall assist GORE

at GORE's sole expense, to obtain patents on all such inventions, designs,

improvements and discoveries, deemed patentable by GORE and shall execute all

documents and do all things necessary to obtain letters patent, vest GORE with full and

exclusive title thereto, and protect the same against infringement by others.

III.     TRADE SECRETS, KNOW HOW, CONFIDENTIAL INFORMATION

ASSOCIATE, during the course of employment with GORE, under this Agreement

will have access to and become familiar with various confidential know-how and trade

secrets including formulae, patterns, devices, secret inventions, processes, machines

and compilations of information, records and specifications which are owned by

GORE, and which are used by GORE in: manufacture, selection, purchasing and

transportation of PTFE and other polymers containing TFE, the manufacturing of

products from PTFE and other polymers containing TFE, dealing in products made

therefrom, or research and development concerning the same. ASSOCIATE shall not

disclose any GORE confidential know-how or trade secrets,

Page 2 of 5                         (Initials)  _TR_

directly or indirectly, nor use them in any way, either during the term of this Agreement or at any time thereafter, except in a manner authorized by GORE. All files, records, documents, drawings, specifications, equipment, and similar items relating to GORE's business or research activities, whether prepared by ASSOCIATE or otherwise coming into his/her possession, shall remain the exclusive property of GORE and the ASSOCIATE agrees to safeguard their confidentiality and return them to GORE when (s)he terminates.

IV.    PUBLIC KNOWLEDGE LIMITATION

ASSOCIATE shall not be permitted to justify disregard of his/her obligations of confidence under this Agreement because specific items of GORE'S know-how are embraced by more general information which is in the public domain. Nor shall a combination of items of know-how be deemed public knowledge because individual items of know-how are in the public domain. For a combination of items of know-how to be considered public knowledge, the combination and its principle of operation must be in the public domain.

V.    NON-COMPETITION BY ASSOCIATE

During the term of this Agreement, ASSOCIATE shall not, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, corporate officer, director or in any other individual or representative capacity, engage or participate in any business that is involved in the manufacture, purchasing, selecting or transportation of PTFE and other polymers containing TFE, manufacturing products from PTFE and other polymers containing TFE, dealing in products made therefrom, or conducting research and development concerning the same.

Page 3 of 5                    (Initials) _TR_

VI.   <u>RESTRICTIVE COVENANTS</u>

In return for the consideration received by ASSOCIATE under the Agreement, ASSOCIATE agrees as part of and ancillary to this Agreement that ASSOCIATE for a reasonable period of time after the termination of his/her employment by GORE, shall not for any reason directly or indirectly, by any means or device whatsoever, for himself/herself or on behalf of, or in conjunction with any person or entity, do any one or more of the following:

(a)   compete with GORE by associating himself/herself in any way with a person or entity that is involved in the manufacturing, purchasing, selecting or transportation of PTFE and other polymers containing TFE or manufacturing of products from PTFE and other polymers containing TFE or dealing in products made therefrom, or conducting research and development concerning the same.

(b)   induce, entice, hire, or attempt to hire or employ any ASSOCIATE of GORE for the purpose of (a).

GORE & ASSOCIATE expressly agree that "a reasonable period of time" as used in this section shall be two (2) years.

GORE & ASSOCIATE further agree that Article VI shall accrue to GORE's benefit irrespective of the reason for termination of this Agreement or the termination of ASSOCIATE'S employment by GORE.

ASSOCIATE further agrees to show a copy of this Agreement to his/her new employer.

Page 4 of 5          (Initials) <u>TR</u>

VII.   CONSIDERATION

In return for accepting the restriction in this Agreement, GORE will pay

ASSOCIATE $400.00/year in addition to his/her regular compensation as long as

ASSOCIATE is employed in an activity requiring this Agreement.

VIII.   REMEDIES

ASSOCIATE agrees that in order to enforce this Agreement, GORE shall be

entitled to all remedies available in law and equity including preliminary and

permanent injunction.


Signed: _____    Date:  24 Jan 08  _____

Associate ID #:_____13371_____

Witness: _____    Date:  1/24/08 .  _____

# EXHIBIT C

<u>Confidential</u>

<u>Position Specification</u>

| | |
|---|---|
| **Title:** | **<u>VP GM PLASTOMER TECHNOLOGIES</u>** |
| **Company:** | PLASTOMER TECHNOLOGIES is a **35 million dollar** division of EnPro Industries and a leading provider of PTFE and engineered plastics solutions focusing on creative and innovative products with exceptional performance and customized solutions for a wide range of industrial arenas. |

Plastomer Technologies produces PTFE tape, fiber and film solutions used in such industries as wire and cable, filtration, electronic, medical, oral care, outdoor fabric and countless others.

Plastomer Technologies offers PTFE rods, cylinders, sheet and sealing solutions. PTFE is compression molded from a variety of blends and compounds to create optimal physical properties for each individual applications.

Plastomer Technologies Amicon Plastics Division offers machined and fabricated plastic components built to print from all types of engineered plastics. Amicon specializes in serving the tight tolerances required of critical industries.

Plastomer Technologies Porter Process Division offers floral polymer etching of film, sheet, tubing and three-dimensional shapes.

| | |
|---|---|
| **Website:** | www.plastomertech.com |
| **Enpro Industries:** | www.enproindustries.com |

EnPro Industries, an NYSE company (Symbol NPO), is a leading provider of engineered industrial products for the processing and general manufacturing industries worldwide. The company operates in three segments: Sealing Products, Engineered Products, and Engine Products and Services. Businesses in the EnPro family include well-known names such as: <u>Garlock Sealing Technologies</u>, <u>Quincy Compressor</u>, <u>Stemco</u>, GGB Bearing Technology, Pikotek, Plastomer Technologies, France Compressor Products, and <u>Fairbanks Morse</u> Engine.

EnPro operates 35 manufacturing facilities in North America, Europe, and Asia and employs 4,500 people worldwide selling

**EXHIBIT C**

products to more than 50,000 customers in over 100 countries around the globe. In recent years, EnPro has opened plants in growing markets such as China and Eastern Europe, and relocated businesses to better serve its customers while modernizing many of its facilities. Sales, segment profits, and segment profit margins have grown consistently since 2002, and record highs were achieved in all three during the second quarter of 2007.

**Location:** Plastomer Technologies is located in Houston, Texas.

**Reporting relationships:** The Vice President/GM will report to the President of Stemco. The position will have the following direct reports: Operations (2), Finance, Human Resources, Sales/Marketing.

**Basic Function:** He/she will be responsible for the management of overall division profit and loss and to provide management leadership of all functional areas to ensure that a strong environment is established and maintained. He/she will direct leadership teams to provide reliable information necessary to manage operations and improve business performance and results, and for ensuring the division conforms to the company quality system procedures and continuous improvement philosophy. He/she will facilitate and direct the five-year strategic planning process and serve as a key member of the senior management team functioning as a strategic partner to the president.

**Roles & Responsibilities:**

1. Develop division long range strategies and objectives, and work with staff members to drive and ensure the success of these goals (20% of time).

2. Collaborate with the senior management team in the area of evaluating business opportunities, alliances and partnerships (20% of time).

3. Develop marketing strategies, evaluate market conditions and recommend policy changes to encourage maximum sales activity (15% of time).

4. Direct and coordinate promotion of products manufactured or services performed to develop new markets, increase share of market, and obtain competitive position in industry (15% of time).

5. Provide resources and direct the team to insure that there are sufficient internal controls to meet the financial reporting and

operational support needs of the company and to comply with regulatory requirements (10% of time).

6. Confer with divisional personnel and review activity, operating, and sales programs to determine if changes in programs and/or operations is required (10% of time).

7. Contribute and lead the professional development of personnel and employees within the division (10% of time).

Short and Mid Range goals of the position:

- Short term the goal will be to consolidate three manufacturing operations into two and three separate organizations into one strong organization.
- Mid to long term the goal will be to design a new business plan that will produce profitable growth through organic and acquisitive expansion while building the Plastomer Technology and key product brands.

**Requirements:**     The business is in the process of consolidating and building new manufacturing operations and developing a new culture. The ideal candidate will be a change manager who has experienced this type of transition.

The ideal candidate will have PTFE, performance polymer or composite experience.

Plastomer Technologies sells into the following industries and experience in these areas would be beneficial: aerospace, semi conductor, consumer products (medical), oil and gas and general industrial.

The ideal candidate will be functioning as a GM, or if he or she has strong potential, is currently functioning as a Business Manager, Sr. Product Manager, Sr. Sales and Marketing Manager or an Operations Manager for a respected global organization.

The candidate will be a strategic thinker who is equally adept at operational excellence.

**The preferred candidate will have experience in acquisitions as well as in business integration.**

The ideal candidate will have a chemical or polymer engineering degree with an MBA.

**Compensation:**     Compensation will be commensurate with experience and include excellent fringe benefits.

**Contact:**                        Jack Stroker, Partner
L & J Associates
Carnegie VIII Building
5925 Carnegie Blvd., Suit 102
Charlotte, NC 28209
704-367-1998
js@ljausa.com

# EXHIBIT B

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

W.L. Gore. & Associates, Inc.,

　　　　　　　　　　　　　　　　Plaintiff,　　　　　　C.A. No. _____

vs.

Charles Thomás Rosenmayer, PhD.,

　　　　　　　　　　　　　　　Defendant.

## MOTION FOR TEMPORARY RESTRAINING ORDER

　　　　Plaintiff W.L. Gore & Associates, Inc. (hereinafter "Gore"), by and through its

attorneys, hereby moves this Honorable Court, pursuant to Court of Chancery Rule

65, for a temporary restraining order enjoining defendant from engaging in any

employment with Plastomer Technologies, or otherwise acting in contravention of his

contractual obligations to Gore. The grounds for this motion are set forth in Plaintiff's

Verified Complaint and the accompanying Memorandum of Law in Support of

Motion for Temporary Restraining Order, filed contemporaneously herewith.

　　　　　　　　　　　　YOUNG CONAWAY STARGATT & TAYLOR, LLP


　　　　　　　　　　　　　_/s/ Martin S. Lessner_____
　　　　　　　　　　　　　Martin S. Lessner, Esquire (No. 3109)
　　　　　　　　　　　　　Michael P. Stafford, Esquire (No. 4461)
　　　　　　　　　　　　　The Brandywine Building
　　　　　　　　　　　　　1000 West Street, 17th Floor
　　　　　　　　　　　　　P.O. Box 391
　　　　　　　　　　　　　Wilmington, Delaware  19899-0391
　　　　　　　　　　　　　Telephone: (302) 571-6698
　　　　　　　　　　　　　Facsimile: (302) 576-3309

　　　　　　　　　　　　　Attorneys for Plaintiff W.L. Gore & Associates, Inc.

Of Counsel:

Charles Knapp
Julie Giddings
FAEGRE & BENSON
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000
(612) 766-1600

Dated: March 28, 2008

fb.us.2733425.01

# EXHIBIT C

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

W.L. Gore. & Associates, Inc.,

                              Plaintiff,          C.A. No. _____

vs.                                         **MEMORANDUM OF LAW IN**
                                            **SUPPORT OF PLAINTIFF'S**
Charles Thomas Rosenmayer, PhD.,            **MOTION FOR TEMPORARY**
                                            **RESTRAINING ORDER**

                              Defendant.

### INTRODUCTION

This action is brought to enjoin the defendant's announced intention to violate his

contractual obligations to W.L. Gore & Associates, Inc. ("Gore" or "the Company") as set

forth in multiple confidentiality and non-competition agreements that he signed during his

sixteen years of employment with Gore as a research scientist and business leader.

Defendant Charles Thomas Rosenmayer ("Dr. Rosenmayer") has worked as a

materials scientist for Gore since 1992 in various important roles for the Company. From

2000 through 2006, Dr. Rosenmayer was employed as Research and Development Leader of

a Gore polytetrafluoroethylene ("PTFE") manufacturing facility in Germany and, in that

capacity, served on Gore's world-wide Core Technology Leadership Team. Since that time,

Dr. Rosenmayer has assumed responsibility as worldwide Project Champion for the Gore

Microelectronics Process Core Team in an effort to enhance and further develop Gore's

existing PTFE applications business in the microelectronics industry. Dr. Rosenmayer has

had intimate access to, and indeed has created, a substantial body of proprietary and

confidential research, know-how and trade secrets regarding Gore's core technologies,

business plans and strategies.

At the outset and during the course of his employment with Gore, Dr. Rosenmayer signed a series of non-disclosure and non-competition agreements that prohibit him from the unauthorized disclosure or use of confidential Gore information, from conducting research and development concerning Gore's core technologies (including PTFE) for two years following the termination of his employment, and from otherwise competing with Gore for one year after the termination of his employment.

On March 25, 2008, Dr. Rosenmayer advised Gore that he had decided to accept a position of employment with a Gore competitor, Plastomer Technologies ("Plastomer"). Like Gore, Plastomer is in the business of manufacturing PTFE and developing innovative products using PTFE technologies, including PTFE-related products and services for the electronics, microelectronics, filtration, medical, and fabrics industries. Dr. Rosenmayer's prospective employment with Plastomer will be to serve as its Vice President and General Manager, responsible for overseeing all aspects of the company's operations. Dr. Rosenmayer advised that his last day of employment with Gore would be March 31, 2008, and that his first day of employment with Plastomer would be April 1, 2008.

Gore has advised Dr. Rosenmayer that his employment with Plastomer would be in contravention of his non-competition obligations with Gore. Gore also has advised Dr. Rosenmayer that given the nature of his employment at Gore, and the nature of his prospective employment at Plastomer, it would be inevitable that he would disclose trade secrets of Gore in the course of his employment at Plastomer, in violation of his non-disclosure obligations with Gore. Gore has offered to continue Dr. Rosenmayer's employment or, in the alternative, to pay for a headhunter in order for Dr. Rosenmayer to find other, suitable employment. Dr. Rosenmayer has refused.

By this motion, and pursuant to Chancery Court Rule 65, Gore seeks a temporary

restraining order enjoining defendant Dr. Rosenmayer from working for Plastomer or

otherwise engaging in any business activity which is in competition with Gore.

Copies of Gore's Verified Complaint, Motion for Temporary Restraining Order, and

this Memorandum of Law have been delivered to Dr. Rosenmayer's attorney by e-mail and

hard copy delivery. Gore also is attempting personal service of Dr. Rosenmayer.

### STATEMENT OF FACTS

## I.   THE PARTIES

### A.   Gore

Gore is a privately-held corporation organized and existing under the laws of the State

of Delaware, having its principal place of business at 555 Papermill Road, Newark,

Delaware. Verified Complaint ("Ver. Compl.") ¶ 4. Founded in 1958, Gore currently

employs approximately 8,000 associates in 45 locations around the world. Ver. Compl. ¶ 5.

Gore's proprietary technologies encompassing polymers made or derived from the

fluoropolymer polytetrafluoroethylene ("PTFE") have resulted in numerous products and

product applications for wire and cable, fabric, medical, filtration membrane, sealant, and

other applications in diverse industries. Id.

### B.   Charles Thomas Rosenmayer, Ph.D

Dr. Rosenmayer is a materials scientist with a B.S. in metallurgical engineering from

the University of Missouri, and a Ph.D in materials science from Rice University. Ver.

Compl. ¶ 5. Gore hired Dr. Rosenmayer in January 1992 to work at Gore's then-wire and

cable manufacturing facility in Manor, Texas. Ver. Compl. ¶ 6. Dr. Rosenmayer has worked

for Gore in a number of locations, and has worked the last several years out of one of Gore's

051718.1001

Elkton, Maryland facilities. Ver. Compl. ¶ 5. Over time, Gore has assigned Dr. Rosenmayer various important job duties that have involved access to Gore's core technologies and research and development efforts. Ver. Compl. ¶ 6. Indeed, Dr. Rosenmayer is the named inventor on at least eight patents relating to Gore technology, including two that were only filed within the last year. Ver. Compl. ¶ 13. Prior to his employment with Gore, Dr. Rosenmayer had little, if any, substantive work experience relating to PTFE, a fluoropolymer that is central to Gore's core technologies. Ver. Compl. ¶ 9.

In approximately 1995, Dr. Rosenmayer transferred to a Gore facility in Eau Claire, Wisconsin, where Gore manufactured semi-conductor technologies using PTFE microemulsions. Ver. Compl. ¶ 10. In this position, Dr. Rosenmayer worked closely with a Gore joint venture research facility in Shanghai, China (Shanghai Gore 3F FluoroMaterials Company, Ltd.) on the development of novel fluoropolymer materials to enhance the performance of semi-conductors and other microelectronics. Id.

In 2000, Dr. Rosenmayer was promoted to the position of Research and Development Leader at Gore's Putzbrunn, Germany PTFE manufacturing facility. Ver. Compl. ¶ 11. In this position, Dr. Rosenmayer had considerable and intimate access with Gore's PTFE technology, polymerization processes, business plans and partnerships, and had the potential to improve or change those details through his activities. Id. As Research and Development leader, Dr. Rosenmayer served on Gore's world-wide core technology leadership team with other top Gore technology leaders throughout the world. Id. This team met regularly to discuss intimate details regarding Gore's research and development, technological processes, business plans and strategies. Id.

Dr. Rosenmayer transferred back to Gore's U.S. operations in approximately 2006.

Ver. Compl. ¶ 12. Since that time, Dr. Rosenmayer has served as Gore's worldwide Project

Champion for the Gore Microelectronics Process Core Team, officing out of one of Gore's

Elkton, Maryland facilities. Id. In that position, Dr. Rosenmayer has been responsible for

leading a team of Gore leaders in interfacing with other Gore business teams, including the

sealant, industrial filtration, fabrics, wire and cable teams, in an effort to enhance and further

develop Gore's existing PTFE applications business in the microelectronics industry. Id. As

Project Champion, Dr. Rosenmayer assumed responsibility for all aspects of this business,

including research and development, manufacturing, marketing, sales, and the interaction

with all other aspects of Gore's business. Id.[1]

---

[1]    Given Dr. Rosenmayer's multiple and significant contacts with Delaware (see Ver.
Compl. 7), the Court has personal jurisdiction over Dr. Rosenmayer. See, e.g., Ciena Corp.
v. Jarrard, 203 F.3d 312, 317-18 (4th Cir. 2000) (non-resident former employee who visited
employer's headquarters in Maryland for training and regular meetings and entered into non-
competition agreement with Maryland-based employer had sufficient contacts with state to
support personal jurisdiction over her in case for breach of non-competition agreement);
Equifax Services v. White & White Inspection and Audit Service, Inc., 905 F.2d 1355, 1357-
59 (10th Cir. 1990) (court had personal jurisdiction over non-resident employee who visited
employer's office in state, had regular contact with employees in state, and was paid from
state; "when forum contacts are a natural result of a contractual relationship, it indicates
purposeful affiliation with the forum through an interstate contractual relationship"); Alta
Analytics Inc. v. Muuss,75 F. Supp. 2d 773, 776 (S.D. Ohio 1999) (Ohio court had
jurisdiction over non-resident employee who executed non-competition agreement in
different state where customer support, payroll, accounting, and human resources
departments were in Ohio and employee regularly received written materials from state and
communicated with individuals in Ohio); Sprint Corp. v. Deangelo, 12 F. Supp. 2d 1184,
1185 (D. Kan. 1998) (Kansas court had jurisdiction over non-resident former employee who
visited Kansas several times per year and communicated with employer in Kansas); Century
Data Systems, Inc v. McDonald, 428 S.E.2d 190 (N.C. Ct. App. 1993) (non-resident
employees subject to personal jurisdiction where made trips to state, received training in
state, and were administered paychecks and other services from employer in state).

## II.   GORE'S EFFORTS TO PROTECT ITS CONFIDENTIAL AND PROPRIETARY INFORMATION AND TRADE SECRETS, AND DR. ROSENMAYER'S CONTRACTUAL OBLIGATIONS TO GORE

Gore has invested substantial money, time, and effort researching the attributes of

PTFE and other fluoropolymers, their methods of manufacture, and refining their use for

commercial applications. Ver. Compl. ¶ 15. This trade secret technology is extremely

valuable to Gore. Id.

To maintain the secrecy of its information and maintain its competitive position, Gore

spends substantial time, effort, and money to develop and maintain the confidentiality of its

trade secrets. Ver. Compl. ¶ 16. Gore requires each employee to sign an agreement in which

the employee acknowledges the nature of Gore's trade secret and confidential information,

agrees not to disclose the information, and agrees not to compete with Gore after the

termination of their employment. In addition, Gore protects its trade secrets through

complex, high-level security measures including security cameras, full-time security

personnel, and an electronic key card system that regulates access to various areas within the

facility and monitors and records the coming and going of all personnel. Id. Visitors to the

facilities must sign in at the front entrance and must be escorted about the facility. Id. Gore

regularly conducts workshops reminding its employees of the criticality of protecting Gore's

trade secrets. Id.

Gore's trade secret and confidential information is disclosed only on a need-to-know

basis, and all associates are trained on this need-to-know policy. Id. The components,

chemistry, manufacturing methods and processing, research and development of PTFE and

PTFE-containing products are deemed by Gore to be secret and are even protected from open

disclosure within Gore by additional confidentiality agreements ("TFE Agreements") and

highly controlled access. Id. For example, Gore restricts access to certain areas within its

facilities in which this work takes place, and documents and internal presentations at which

this work is discussed, only to the relatively small group of employees who have signed the

TFE Agreements. Id.

## A.    Dr. Rosenmayer's Service Agreement

At the inception of his employment on January 6, 1992, Dr. Rosenmayer executed (as

required by all new employees) a service agreement with Gore (hereinafter, the "Service

Agreement"). Ver. Compl. ¶ 18, Exh. A. In that agreement, Dr. Rosenmayer acknowledged

and agreed that:

- Gore developed its "paper work, documents and know-how," including
  "customer lists, manufacturing processes, devices, techniques, plans,
  methods, drawings, blueprints reproductions, data, tables, calculations,
  and letters . . . at great expense and over lengthy period of time;"

- this information is "unique and constitute[s] the exclusive property and
  trade secrets of Gore;"

- any use of this information by Dr. Rosenmayer "other than for the sole
  benefit of Gore" would be wrongful and would injure Gore irreparably;

- Dr. Rosenmayer could not disclose or use this information for his own
  benefit or the "direct or indirect" benefit of anyone other than Gore
  without Gore's written consent;

- if Dr. Rosenmayer violated the Agreement, Gore would be entitled to
  preliminary and permanent injunctive relief and an equitable
  accounting;

- if his employment was terminated, Dr. Rosenmayer would promptly
  deliver back to Gore all Gore information "in his possession or under
  his control" and would "not engage in any business activity in
  competition with Gore" for one year thereafter;

- if, during his employment or for three years afterward, Dr. Rosenmayer
  made or conceived "improvements or inventions" relating in any way

to Gore's activities or business, Dr. Rosenmayer would promptly
disclose them and they would be Gore's property exclusively; and

- upon termination of this employment, Dr. Rosenmayer would not
engage in any business activity in competition with Gore for a period of
one (1) year thereafter.

Id.

## B.    Dr. Rosenmayer's TFE Agreements

As a condition of being granted access to Gore's core technology, Gore required Dr.

Rosenmayer to execute a second agreement, entitled "Tetrafluoroethylene Polymers

Confidentiality and Non-Competition Agreement" (the "TFE Agreement").   Ver. Compl. ¶

19.  Dr. Rosenmayer was first asked to sign a TFE Agreement after his transfer to Gore's

Eau Claire facility in the late 1990's, and has signed successive TFE Agreements thereafter.

Id. Dr. Rosenmayer received additional compensation from Gore each year in consideration

of signing these agreements.  Id.  For example, Dr. Rosenmayer received a $400 bonus in

2005, 2006, 2007, and 2008 for signing the TFE Agreement in each of those years.  Id.  In

this agreement, Dr. Rosenmayer acknowledged that:

- Gore had invested "considerable time, effort, and many millions of
dollars" in developing and refining technology involving PTFE and
other tetrafluoroethylene polymers;

- Gore intended to continue to develop and refine this technology,
and Gore's continued success depended upon this technology
remaining the sole property of Gore, and not known to or used by
others; and

- Gore had entrusted Dr. Rosenmayer with know-how, and Dr.
Rosenmayer "recognizes the valuable and confidential nature of this
know-how" and "understands that its use or knowledge by others
would be detrimental to Gore."

Ver. Compl. Exh. B. Accordingly, Dr. Rosenmayer agreed in the TFE Agreements to

undertake the following supplemental obligations to Gore:

- Dr. Rosenmayer would "promptly and fully inform and disclose to Gore all inventions, design improvements, and discoveries" made or conceived during his employment with Gore, whether Dr. Rosenmayer conceived them "alone or with others and whether or not conceived during regular working hours. All such inventions, designs, improvements and discoveries shall be the exclusive property of Gore;"

- while employed with Gore, Dr. Rosenmayer would "have access to and become familiar with various confidential know-how and trade secrets" of Gore, including information "used by Gore in manufacture, selection, purchasing and transportation of PTFE and other polymers containing TFE, the manufacturing of products from PTFE and other polymers containing TFE, dealing in products made therefrom, or research and development concerning the same;"

- Dr. Rosenmayer "shall not disclose any Gore confidential know-how or trade secrets, directly or indirectly, nor use them in any way, either during the term of this Agreement or any time thereafter, except in a manner authorized by Gore;"

- "[a]ll files, records, documents, drawings, specifications, equipment, and similar items relating to Gore's business or research activities, whether prepared by [Dr. Rosenmayer] or otherwise coming into his[] possession, shall remain the exclusive property of Gore" and Dr. Rosenmayer would "safeguard their confidentiality and return them to Gore when []he terminates;" and

- for two years after termination of his employment with Gore, Dr. Rosenmayer "shall not for any reason, directly or indirectly, by any means or device whatsoever . . . compete with Gore by associating himself[] in any way with a person or entity that is involved in the manufacturing, purchasing, selecting, or transportation of PTFE . . . or conducting research and development concerning the same."

Id.

**C.    Dr. Rosenmayer's Access To and Recognition of the Confidentiality**
       **of Gore Proprietary Information**

Dr. Rosenmayer has worked on highly sensitive and proprietary projects at Gore, and

has had intimate access to Gore's PTFE technology, manufacturing processes, intellectual

property discussions, business plans and strategic planning.  Ver. Compl. ¶ 21.  He has been

employed as a global research and development leader for Gore, and from 2000 through

2006 was responsible for the manufacture, processing, and improvement of technologies

relating to the manufacturing and process of PTFE at Gore.  Ver. Compl. ¶ 22.  He is

currently heading up a team of Gore associates responsible for the development of an entire

line of business for Gore in the microelectronics area.  Ver. Compl. ¶ 23.

Given his status with the Company, Dr. Rosenmayer has been allowed to attend

meetings in which the most sensitive of Gore trade secret information is discussed regarding

all aspects of the Company's business, including Gore Intellectual Property Committee

meetings and Gore Core Technology Leadership Team meetings.  Ver. Compl. ¶ 24.  He also

was invited to, attended and even organized internal research and development meetings at

Clayton Hall at the University of Delaware that are held on a monthly basis and which are

open only to higher-level Gore associates.  Ver. Compl. ¶ 7.

In addition, as a core technology leader at Gore, Dr. Rosenmayer has received internal

written communications regarding highly confidential and proprietary trade secrets regarding

all aspects of Gore.  Ver. Compl. ¶ 24.  For example, Dr. Rosenmayer received  regular "TFE

Polymerization Platform Monthly Technical Reports,"  which are replete with proprietary

technical detail, and summarized in technical detail the status of various Gore research and

development projects throughout the company (not just those projects or products upon

which Dr. Rosenmayer worked). Id. These reports included proprietary information on

projects involving Gore's pioneering efforts in other area, including biomedical and fuel cell

applications. Id. Each and every one of these internal reports were marked

"CONFIDENTIAL GORE PTFE TECHNOLOGY" and the distribution was limited to a

handful of top Gore research and development leaders. Id. Further dissemination of the

reports were expressly limited to "PTFE Agreement signers only." Id.

## III.    DR. ROSENMAYER'S REPUDIATION OF HIS NON-COMPETE OBLIGATIONS AND ACCEPTANCE OF EMPLOYMENT WITH PLASTOMER TECHNOLOGIES

On or about March 13, 2008, Dr. Rosenmayer advised Gore that he was considering

accepting an offer of employment with Plastomer as its Vice President and General Manager.

Ver. Compl. ¶ 2. Because Plastomer is a direct competitor of Gore, Gore advised Dr.

Rosenmayer that his proposed new employment was unacceptable insofar as it violated his

contractual obligations to Gore. Id. Gore offered to continue Dr. Rosenmayer's employment

or to pay for a headhunter to assist Dr. Rosenmayer to find employment that did not violate

his contractual obligations to Gore. Id. However, on March 25, 2008, Dr. Rosenmayer

refused Gore's offer, proffered his resignation of employment with Gore, and advised Gore

that he intended to commence employment with Plastomer on Tuesday, April 1, 2008. Id.

Plastomer is a division of EnPro Industries, Inc. Ver. Compl. ¶ 26. EnPro operates

35 manufacturing facilities throughout North America, Asia and Europe, and purports to be a

"leading provider of engineered industrial products for the process and general

manufacturing industries worldwide." Id. Like Gore, Plastomer represents itself to be a

"provider of PTFE . . . solutions focusing on creative and innovative products . . . for a wide

range of industrial arenas," including "wire and cable, filtration, electronic, medical, oral

care, outdoor fabric and countless others." Ver. Compl. ¶ 27-30, Exh. C. Like Gore,

Plastomer currently sells into the semi-conductor and medical industries, among others. Id.

Indeed, both Gore and Plastomer manufacture PTFE and are engaged in processing PTFE

into tapes and fibers for, among other uses, applications in industrial products, such as wire

and cable, microelectronics, sealants and membranes. Id.

Dr. Rosenmayer has provided Gore a copy of the job description for the job he has

accepted (the "Job Description"). Ver. Compl. ¶ 27, Exh. C. According to the Job

Description, Plastomer considered as the ideal candidate for the position someone with PTFE

experience and with experience developing and selling PTFE applications in the semi

conductor, medical and general industrial industries. Ver. Compl. Exh. C. The Job

Description also makes clear that the position will be responsible for the overall management

of Plastomer's operations, including: (1) developing business strategies and evaluating

business opportunities; (2) developing marketing strategies and evaluating market

conditions; and (3) providing management leadership to all functional areas of Plastomer,

including research, development and manufacturing personnel. Id.

Both Plastomer and Gore manufacture the same category of products utilizing PTFE

technology, including tape for cable assemblies, and PTFE applications for the

microelectronics industry, including semi-conductors. Ver. Compl. ¶ 31. Dr. Rosenmayer

has been involved in all of these applications at Gore since he was hired in 1992, and has

served as Gore's Project Champion for the Microelectronics Process Core Team (which has

targeted, among other industries, the semi-conductor industry) since 2007. Id. It is

inconceivable that he could perform the job required of him as General Manager of

Plastomer without utilizing his vast knowledge of Gore's trade secret technology,

manufacturing processes, business plans and strategies.

## ARGUMENT

### I.    APPLICABLE LAW

A threshold issue in this matter is what law this Court should apply in deciding this

motion.  With respect to what test the court should apply for determining whether a

temporary injunction is appropriate, this Court should apply Delaware common law

regarding the elements necessary to establish whether injunctive relief is appropriate.

Deloitte & Touche U.S.A. LLP v. Lamela, Del. Ch., C.A. No. 1542-N, 2005 Del. Ch.

LEXIS 164, at *17 (2005) ("The standard for determining whether to grant a preliminary

injunction is procedural and therefore governed by Delaware law."); Custom Video v. N.A.

Video, Del. Ch., C.A. No. 9261, 1987 Del Ch. LEXIS 488, at *2-3 (1987) (applying

Delaware law standards for preliminary injunction where a different state's substantive law

governed).

Although the Court should apply the Delaware common law test in determining

whether a temporary restraining order is appropriate, the issue of what law the Court should

apply in determining whether the plaintiff can satisfy that test is another issue.  See Custom

Video, 1987 Del Ch. LEXIS 488, at *2-3.  In determining what state substantive law to

apply, the court must follow Delaware's choice of law rules.  See Klaxon Co. v. Stentor

Electric Manufacturing Co. Inc., 313 U.S. 487 (1941); Perez v. Short Line, Inc., Del. Super.,

231 A.2d 642, 643 (1967).  Delaware law provides that a court need not engage in a choice

of law analysis where no conflict has been established between the potentially applicable

laws.  Merck & Co. v. SmithKline Beecham Pharms. Co., Del. Ch., C.A. No. 15443-NC,

1999 Del. Ch. LEXIS 242, at *49-50 (1999) ("Choice of law is an issue that need not be

resolved. No party has pointed to any substantive difference in the laws of the various states

having some contact with the matters at issue."); Shook & Fletcher v. Safety National

Casualty Corp., Del. Supr., 909 A.2d 125, 128 (2006) (absent conflict of law, no need for

choice of law analysis and court may apply law of forum state); Sun-Times Media Group,

Inc. v. Royal & SunAlliance Ins., Del. Super., C.A. No. 06C-11-108 RRC, 2007 Del. Super.

LEXIS 402, at *29 (2007) ("absent any conflict, the Court may apply general principles that

are consistent with the law of either jurisdiction...choice of law is not an issue ...at this time

because there is no demonstrated conflict"). Here, the only potentially applicable laws are

those of the State of Delaware and the State of Maryland. Although Dr. Rosenmayer may

argue that the law of the State of Maryland is more applicable given that he has been

assigned to work in Maryland, the common law in both states in this area is substantially

similar. Trinity Transport, Inc. v. Ryan, Del. Ch., C.A. No. 922, 1986 Del. Ch. LEXIS 468,

at *4-5 (1986). Thus, absent an actual conflict of laws in this case, the Court should apply

the laws of its own jurisdiction in this case.[2]

---

[2]     If there were an actual conflict between the laws of Delaware and Maryland, the
choice of law question would be analyzed under the "most significant relationship" test.
Reese v. Wheeler, Del. Super., C.A. No. 99C-04-002-RFS, 2003 Del. Super. LEXIS 388, at
*9 (2003). Under the test, a Court considers the following contacts in applying conflicts of
law principles: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the
place of performance; (d) the location of the subject matter of the contract; and (e) the
domicil, residence, place of incorporation, and place of business of the parties. Id. Courts
consider those factors in applying the following choice of law considerations: (a) the needs
of the interstate system; (b) the relevant policies of the forum; (c) the relevant policies of
other interested states; (d) the protection of justified expectations; (e) the basic policies
underlying the particular field of law; (f) certainty, predictability and uniformity of result;
and (g) ease in determination and application of law to be applied. Travelers Indemnity Co.
v. Lake, Del. Supr., 594 A.2d 38, 47 (1991). Under that test, Delaware's laws should still be
applied to this case. Delaware has a significant connection with the facts of this matter,

## II.    GORE IS ENTITLED TO A TEMPORARY RESTRAINING ORDER

### A.    Standard for Relief

In deciding whether to grant a motion for a temporary restraining order, the Court

must consider the following factors:  (1) whether the plaintiff has demonstrated a colorable

claim; (2) the possibility of irreparable harm to the plaintiff if the injunction is not granted;

and (3) whether the balance of hardships favors the granting of an injunction after weighing

the equities involved.  Robert M. Bass Group, Inc. v. Evans, Del. Ch., C.A. No. 9953,

Jacobs, V.C. (June 10, 1988), transcript at 4-6; Cottle v. Carr, Del. Ch., C.A. No. 9612, 1988

Del. Ch. LEXIS 21, at*6-8, (Feb. 9, 1988).  Consideration of these factors demonstrates that

Gore is entitled to the relief it seeks.

### B.    Gore Has Established a Colorable Claim

In reviewing whether a plaintiff has presented a "colorable claim," a court must

accept the facts alleged as true.  UIS, Inc. v. Walbro Corp., Del. Ch., C.A. No. 9323, slip. op.

at 3 (Allen, C.) (Oct. 5, 1987).  A colorable claim is one that "is not frivolous on its face."

Newell & Assocs. v. Newell, Del. Ch., C.A. No. 16113-NC (Chandler, C.) (Dec. 29, 1997),

transcript at 17.  As discussed below, Gore has asserted a colorable claim (and in fact, has a

strong likelihood of success on the merits).

---

given that Gore is a Delaware corporation with its principal place of business in Delaware, the consideration for the agreements at issue was paid from Delaware, and Dr. Rosenmayer performed substantial duties, including the filing of several patents to which Dr. Rosenmayer is the named inventor, in Delaware.  Moreover, application of Delaware law would simplify the judicial task of this Court, as the Court presumably is more familiar with Delaware law than any other state law.  Also, application of Delaware law would advance the interests of Delaware, given the state's long history of recognizing the validity of restrictive covenants and significant interest in protecting corporations doing business in Delaware from the breaching of such contracts and the loss of trade secrets and confidential information.

Dr. Rosenmayer's announced employment with Plastomer clearly would constitute a breach of his Service Agreement and TFE Agreements with Gore. Dr. Rosenmayer's agreements with Gore impose enforceable contractual obligations on Dr. Rosenmayer. See, e.g., Bunnell Plastics, Inc. v. Gamble, Del. Ch., C.A. No. 5913, 1980 Del. Ch. LEXIS 629 (1980) (employer's protectable interest includes legitimate interest in protecting business secrets disclosed to employees) (citing Solari Industries, Inc. v. Malady, 55 N.J. 571, 264 A.2d 53 (1970)); Capital Bakers, Inc. v. Leahy, Del. Ch., 178 A. 648 (1935) (signing of covenant not to compete at inception of employment relationship provides sufficient consideration); Hammermill Paper Co. v. Palese, C.A. No. 7128 (1983) (payment to plaintiff in exchange for signed covenant not to compete constitutes adequate consideration).[3]

There can be little dispute that Dr. Rosenmayer has in fact announced his intention to act in violation of his Service Agreement and TFE Agreements. Dr. Rosenmayer has agreed to commence employment with a direct competitor of Gore in only a few days as its Vice President and General Manager. This is in violation of the commitment he made in his Service Agreement to refrain from engaging in any business activity in competition with Gore for a period of one year following his termination of employment. At Plastomer, Dr. Rosenmayer will oversee Plastomer's research, development, business strategies, and marketing strategies for the research, development, manufacture and application of PTFE. This is in violation of the commitment he made in the TFE Agreements to refrain for a

---

[3]    See also Becker v. Bailey, 268 Md. 93, 299 A.2d 835, 838 (1973) (covenants not to compete will be enforced to prevent misuse of employer's trade secrets); Gill v. Computer Equip. Corp., 266 Md. 170, 292 A.2d 54, 59 (1972) (signing of covenant not to compete at inception of employment provides sufficient consideration); Ruhl v. F.A. Bartlett Tree Expert Co., 245 Md. 118, 225 A.2d 288, 290 (1967) (increase in pay constitutes sufficient consideration).

period of two years following the termination of his employment with Gore from associating

with any entity that is involved in the research, development or manufacture of PTFE, or

involved in dealing with products made from PTFE.

　　　In addition, it is inevitable that Dr. Rosenmayer will utilize Gore trade secrets in his

new capacity at Plastomer, in further violation of his contractual obligations to Gore.  Gore's

processes for the manufacture of PTFE, its recipes, its research and development for the

application of PTFE for various products, and its business plans and strategies relating to the

same are not generally known to others, they would be valuable to others, and they are

subject to measures to maintain their secrecy.  They qualify as trade secrets.  6 Del. C. §

2001(4); W.L. Gore & Associates, Inc. v. Wu, Del. Ch., C.A. No. 263-N, 2006 Del. Ch.

LEXIS 176, at *49-50 (2006);  Merck & Co., 1999 Del. Ch. LEXIS 242, at *50-64;

American Totalisator Co. Inc. v. Autotote Ltd., Del. Ch., C.A. No. 7268 (Longobardi, V.C.)

(Aug. 18, 1983) (granting plaintiff's motion for temporary restraining order against

disclosure of trade secrets by former employee and finding that "[t]he record can support a

finding that the contested material is 'secret' or 'substantially secret' and the duty to keep it

secret arose from the very relationship of employer and employee that existed between

Plaintiff and [the former employee]."); Perolin Co. v. West, Del. Ch., C.A. No. 670-K

(Hartnett, V.C.) (Dec. 8, 1980), Let. Op. at 5 (the "general rule . . . is that even in the absence

of a contractual restriction a former employee is precluded from using for his own advantage,

and to the detriment of his former employer, confidential information or trade secrets

acquired by or imparted to him in the course of his employment."); 6 Del. Code Ann. § 2001

(2003).[4]

In his position at Plastomer, it is inconceivable that Dr. Rosenmayer could perform

his job in overseeing Plastomer's PTFE manufacturing operations, PTFE processing and

product applications, research and development, and business planning without utilizing his

vast knowledge of Gore's trade secret technology, manufacturing processes, research and

development. business plans and strategies. Because of the inevitability of such disclosure,

injunctive relief also is appropriate. See E.I. duPont de Nemours & Co. v. American Potash

& Chemical Corp., Del.Ch., 200 A.2d 428 (1964) (court granted both a temporary restraining

order and a preliminary injunction to prevent a former employee of the plaintiff from

commencing his duties with a competitor of the plaintiff which contemplated the

development of a chemical process for the competitor similar to the one then solely in the

possession of the plaintiff); W.L. Gore, 2006 Del. Ch. LEXIS 176, at *49-50 (granting

plaintiff's injunction due to inevitable disclosure because defendant's "knowledge would

almost certainly filter into his work and result in disclosure of [plaintiff's] trade secrets");

American Hoechst Corp. v. Nuodex, Inc., Del. Ch., C.A. No. 7905, 1985 Del. Ch. LEXIS

441, at *7 (1985) ("Injunctions have been granted to protect former employers when an

employee has taken a job with a competitor, the nature of which will demand that the

employee disclose and use trade secrets of the former employer regardless of the employee's

intent so to disclose or to make use of the trade secrets.").[5]

---

[4]     The same legal standards apply should the Court conclude that Maryland law applies.
See Maryland Credit Fin. Corp. v. Haggerty, 216 Md. 83, 139 A.2d 230 (1958); Space Aero
Prods. Co. v. R.E. Darling Co., 238 Md. 93, 208 A.2d 74, reh'g denied, 238 Md. 129, 208
A.2d 699, cert. denied, 382 U.S. 843 (1965); Md. Code § 11-1201, et seq.

[5]     See also Union Carbide Corp. v. UGI Corp., 731 F.2d 1186, 1189-91 (5th Cir. 1984)

### C.   Gore Will Suffer Irreparable Harm if Dr. Rosenmayer is Not Enjoined.

There can be no doubt that Gore and its employees will suffer irreparable harm unless Rosenmayer is enjoined from employment with Plastomer. Dr. Rosenmayer himself has acknowledged the irreparable harm to Gore as a result of his conduct. In the Service Agreement, Dr. Rosenmayer acknowledged that, "the use of [Gore's confidential know-how] and trade secrets by the undersigned other than for the sole benefit of Gore would be wrongful and *would cause irreparable injury to Gore.*" Ver. Compl. Exh. A. (emphasis added). Similarly, in the TFE Agreements, Dr. Rosenmayer acknowledged that not disclosing Gore's confidential know-how "is essential" to the continued success of Gore. Ver. Compl. Exh. B.

Courts regularly find the irreparable harm element satisfied and grant injunctive relief when it is highly likely or inevitable that a former employee will use or disclose trade secret information upon commencing employment with the plaintiff's competitor. Pfizer Inc. v. ICI Americas Inc., Del. Ch., C.A. No. 7785, 1984 Del. Ch. LEXIS 566, at *21 (1984) ("The law

---

("failure of [new employer] to exclude [plaintiff's former employee] from a situation where disclosure of confidential information would be difficult to avoid"); FMC Corp. v. Varco Int'l, Inc., 677 F.2d 500, 504-05 (5th Cir. 1982) ("[plaintiff's former employee] has been placed in a comparable position with a direct competitor without restriction against using or disclosing [plaintiff's] trade secrets -- the fear of irreparable injury is realistic"); BIEC Int'l, Inc. v. Global Steel Servs., 791 F.Supp. 489, 551-52 (D. Pa. 1992) (granting plaintiff's injunction because "[i]n light of the vast amounts of technical and business information the defendants have committed to memory by [working for plaintiff], it would be impossible for defendants to compete in this area without drawing on at least some [of plaintiff's] confidential material.") Air Products and Chemicals, Inc. v. Johnson, 442 A.2d 1114, 1124 (Pa. Super. Ct. 1982) (upholding trial court's ruling granting injunction because "[i]t would be impossible [for defendant] to perform his managerial functions in on-site work without drawing on the knowledge he possesses of [plaintiff's] confidential information"); Emery Industries, Inc. v. Cottier, 202 U.S.P.Q. (BNA) 829, 834 (S.D. Ohio 1978) ("There can be no doubt of the present threat of disclosure in any case in which the transfer of employment is to a head-to-head competitor and the responsibilities in the employments are comparable.").

is settled in this State that where an employee has expressly agreed as one of the terms of his

contract of employment that he will not disclose to his employer's detriment any trade secrets

or confidential information which he has acquired in the course of his employment, the

employer is entitled to an injunction against a threatened use or disclosure of such

confidential information by its former employee for his own benefit or for the benefit of a

third person."); American Hoechst Corp., 1985 Del. Ch. LEXIS 441, at *7; American

Totalisator Sys. v. Automatic Totalisators Ltd., Del. Ch., C.A. No. 5562, 1978 Del. Ch.

LEXIS 529, at *6-7 (1978) (temporary restraining order and a preliminary injunction granted

to prevent a former employee of the plaintiff from commencing his duties with a competitor

of the plaintiff where former employee would likely use trade secrets).[6]

Because Gore and its employees will suffer irreparable harm if Dr. Rosenmayer is

allowed to reveal its proprietary and confidential research and development to advance

Plastomer's business and marketing strategies, research, and development, the Court should

issue a temporary restraining order. See Allen v. Prime Computer, Inc., 540 A.2d 417, 421

(Del. 1988); Gimbel v. Signal Cos., 316 A.2d 599, 603 (Del. Ch.), aff'd, 316 A.2d 619 (Del.

---

[6]    See also SI Handling Systems, Inc. v. Heisley, 753 F.2d 1244 (3d Cir. 1985);
PepsiCo, Inc. v. Redmond, No. 94C6838, 1995 U.S. Dist. LEXIS 19437, at *84-85 (D. Ill.
1995) ("where trade secrets and confidential information are at issue, as they are here,
irreparable harm flows necessarily from the actual or threatened loss of the important
protectible business interests at stake. Therefore, a preliminary injunction is the only remedy
adequate to curtail the irreparable harm that would otherwise inevitably follow." (citing
Taiwan v. Tainan, 730 F.2d at 63-64; Franke v. Wiltschek, 209 F.2d 493, 498 (2d Cir. 1953);
BIEC, 791 F.Supp. at 551-52 (granting plaintiff's injunction in which defendant former
employees started a competitor business because irreparable harm would ensue due to
defendants' knowledge of plaintiff's trade secrets); Penetone Corp. v. Palchem, Inc., 627 F.
Supp. 997, 1005-07 (N.D. Ohio 1985)); Allis-Chalmers Mfg. Co. v. Continental Aviation
Eng. Corp., 255 F.Supp. 645 (E.D. Mich. 1966); National Starch & Chem. Corp. v. Parker
Chem. Corp., 219 N.J. Super. 158, 530 A.2d 31 (App. Div. 1987); Air Products and
Chemicals, Inc. v. Johnson, 442 A.2d 1114 (Pa. 1982).

1974); E.I. DuPont, 200 A.2d at 431. Once Dr. Rosenmayer commences employment with

Plastomer, Gore's trades secrets and confidential information regarding PTFE will be lost

permanently.

**D.    The Balance of Hardships Favors Gore.**

The balance of harm in this case weighs in favor of granting the temporary restraining

order. As explained above, Gore and its employees would face irreparable harm if one of its

global technology leaders is allowed to take a position as general manager of a competing

company. Gore's trade secret information inevitably would end up in the hands of its

competitor, and Gore will then have lost a competitive advantage it has earned through a

significant investment of time and money in certain research and development.

In contrast, Dr. Rosenmayer is required to do nothing more than that which he

voluntarily agreed to do when he signed his Service Agreement and TFE Agreements. An

order against Dr. Rosenmayer enforcing those agreements would not be unfair to Dr.

Rosenmayer, as he plainly was aware of his contractual obligations. Moreover, in light of

Gore's prior offer to continue Dr. Rosenmayer's employment or pay for a headhunter to find

him other suitable employment, Dr. Rosenmayer would be hard pressed to establish any real

hardship. Accordingly, weighing the hardships does not present a reason for refraining from

granting a temporary restraining order. See Technicon Data Sys. Corp. v. Curtis 1000 Inc.,

Del. Ch., C.A. No. 7644 (Berger, V.C.) (Aug. 21, 1984) (injunction granted against

misappropriation of trade secrets where financial impact on defendant or the public interest

do not outweigh the harm to plaintiff); SI Handling Systems, Inc. v. Heisley, 753 F.2d 1244

(3d Cir. 1985) (balance of harms weighs in favor of plaintiff former employer where there is

risk of trade secret disclosure to defendant's new employer); PepsiCo, 1995 U.S. Dist.

LEXIS 19437, at *84-85 (same).

## CONCLUSION

For the reasons stated above plaintiff respectfully requests that this Court grant its

motion for a temporary restraining order.


YOUNG CONAWAY STARGATT & TAYLOR, LLP


_/s/ Martin S. Lessner_____
Martin S. Lessner, Esquire (No. 3109)
Michael P. Stafford, Esquire (No. 4461)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone: (302) 571-6698
Facsimile: (302) 576-3309

Attorneys for Plaintiff W.L. Gore & Associates, Inc.

Of Counsel:

Charles Knapp
Julie Giddings
FAEGRE & BENSON
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000
(612) 766-1600

Dated: March 28, 2008


fb.us.2730021.06


DB01:2534014.1                                                           051718.1001

# EXHIBIT D

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

W.L. Gore. & Associates, Inc.,

                    Plaintiff,        C.A. No. _____

vs.

Charles Thomas Rosenmayer, PhD.,

                    Defendant.

### TEMPORARY RESTRAINING ORDER

Having heard argument from counsel on plaintiff W.L. Gore & Associates, Inc.'s ("Gore") Motion for a Temporary Restraining Order, and having reviewed all papers submitted herein, and it appearing to the Court that plaintiff has satisfied the standards necessary for the granting of a temporary restraining order,

IT IS HEREBY ORDERED, this _____ day of _____, 2008, at __:____ __.m., that

1.    Defendant Charles Thomas Rosenmayer, and any persons acting in concert or participation with them, are hereby enjoined from:

    a.    disclosing or using any confidential, proprietary or trade secret research, information, know-how, and/or material of Gore, including without limitation any such research, information, know-how and materials related to fluoro ionomers and fluoropolymers;

    b.    commencing employment with Plastomer Technologies or any entity related to Plastomer Technologies; and

      c.     engaging or participating in any business activity which is in competition with Gore, including without limitation the manufacture, sale, or research and development of polytetrafluoroethylene ("PTFE") or products made from, derived from, or related to PTFE.

      2.     Plaintiff shall file with the Register in Chancery a bond on or before April ___, 2008, which bond need only be executed in the amount of $_____ without surety for the payment of such costs and damages as may be incurred or suffered by defendants if they are found to have been wrongfully restrained.

      3.     Unless further extended by the Court, this Order shall expire on April ___, 2008.

      4.     A preliminary injunction hearing on plaintiff's application to continue the effect of this Order shall be held on _____, 2008, commencing at __:__ _.m., in Wilmington, Delaware.

      5.     The parties may conduct expedited discovery such that discovery will be completed within ___ business days before the preliminary injunction hearing.

_____

Chancellor

fb.us.2729795.02